WeldoN, J.,
delivered the opinion of the court:
On the 14th day of Jufy, 1868, the United States entered into a convention with the Republic of Mexico, for the appointment and organization of a commission to adjust and determine such claims of citizens of the United States against the Republic of Mexico, and claims of citizens of said Republic against the United States, as had been presented to the Government of either party to said convention, for its interposition with the other since February 3, 1848, and which might be presented to the commissioners to be appointed under said convention within eleven months from the day of their first meeting. The commissioners appointed by the respective parties held their first meeting on July 31, 1869.
On the 8th day of March, 187,0, the decedent first informed the complainants of the existence of a claim against the Government of Mexico for the sum of §334,950, with interest, and presented to the Department of State by his attorney a notice of such claim, accompanied by certain certificates and affidavits. The notice with the accompanying certificates and affidavits were referred by the Secretary of State to the commissioners.
The claim filed by the decedent is in the words and figures following, to wit:
“I, Benjamin Weil, a citizen of the United States of America, do by these presents declare that on or about the 20th of September, 1864, I had on several trains in the Republic of Mexico and under my special control the following-described property, belonging solely to myself: Nineteen hundred and fourteen bales of cotton, average weight of five hundred pounds, or nine hundred and fifty-seven thousand pounds, at 35 cents per pound, making §334,950. Said property was at *44 that time then and there on the Mexican territory between Piedras Negras and Laredo, etc.; that it was seized and by force taken from me by the representative forces of the Republic of Mexico then in command of that portion of the country; that I often solicited the release of my property, but could obtain no satisfaction whatsoever; that I have never laid this claim before either the United States or Mexican Government asking- payment thereof; that I have never transferred my rights or any portion thereof to any other person or persons.
“That I was at the time of the seizure of my cotton by the Mexican Government a citizen of the United States, as per annexed certificate of oath of my naturalization; that at the time of the seizure of my cotton by the Mexican Government I was and am now a citizen of the United States of America, and my home was then and is now New Orleans, Louisiana.
“ That I was born in Bony wilier, Bas Rhin, France; am now 46 years old, and have resided in the State of Louisiana since the 12th of June, 1850; am a merchant by occupation; that I was at the time of the seizure of my cotton stopping at Mata-moros, Mexico; that my property was not insured from the fact that no insurance could be effected on wagon or land transportation.
“B. Weil.
“ New ObleaNS, September 10, 1869.
“ Sworn to and subscribed before me this 10th September, 1869.
“Ii. Loew, IT. S. Gom. [seal.]
“I, the undersigned, hereby certify that the above statement is correct.
“Geo. D. Hite.”
On the 27th day of April the agent of the United States caused to be exhibited and filed with the commission a memorial of said claim, in which are embraced the substantial allegations contained in the claim as filed in the Department of State, with such proofs as were produced by the attorneys and agents of the decedent.
Upon such memorial and proofs the claim was heard by the commissioners; and upon a difference of opinion on the part of the commissioner of the United States and the commissioner of the Government of Mexico, it was referred to an umpire who, on the first day of October, 1875, decided that there should be paid by the Republic of Mexico on account of said claim to decedent the sum of $285,000 in Mexican gold, with *45 interest thereon at 6 per cent per annum from the 20th clay of September, 1864, to the date of the final award.
The Republic of Mexico being, dissatisfied with the award rendered as aforesaid, made a motion for a rehearing-, and presented to the consideration of the umpire certain affidavits tending to show that the claim was fraudulent; but the rehearing was denied, and on the 31st day of July, 1876, a final award was made, including interest to that date, in the sum of $487,810.68.
Thereafter the Government of Mexico being dissatisfied with the allowance of the claim continued to press upon the consideration of the Government of the United States the injustice of such claim until on the 29th day of December, 1892, an act was passed directing the Attorney-General of the United States to bring a suit, or suits, in this court in the name of the United States against the said decedent, his legal representatives or assigns, to determine whether the award made as aforesaid, in respect of the claim of said Weil, was obtained as to the whole sum included therein, or as to any part thereof, by fraud effectuated by means of false swearing, or other false and fraudulent practices upon the part of Weil or his agents, attorneys, or assigns, and in case it be so determined to bar and foreclose all claim in law and equity on the part of said Weil, his legal representatives, and assigns to the money or any part thereof recovered from the Republic of Mexico; and the Court of Claims is given power to make all necessary interlocutory and final decrees, and enforce the same by injunction or any proper final process.
In pursuance of the power conferred on the complainants the Attorney-General of the United States at the December t<5rm, 1892, filed a bill in which are substantially alleged a history of the claim, its presentation to the commissioners, the award of the umpire upon the disagreement of the commissioners of the respective parties, the payment of the award in installments, the distribution of the same until the suspension of distribution for the purpose of investigation, the amount still in hand, to wit, the sum of $287,823.77, and the passage of the act of December, 1892, under which this proceeding was commenced.
"The allegations of the eighteenth paragraph of the bill being *46 in direct conflict with, and in contradiction of, the allegations of the claim as made before the commission, both in the sworn statement of the decedent and his memorial filed in the legal exemplification of it, presents the question of fact which is to determine the rights of the respondents and the duty of the complainants as to the undistributed portion of the award of the joint commission.
The eighteenth paragraph is as follows:
“Your orator further shows that, in fact, the said Weil never owned or had possession of the cotton mentioned in said claim, or any part thereof; that he never had said cotton, or any part thereof, in transportation through any of the States of your orator, or of the Republic of Mexico, as stated in said statement, memorial, and proofs, and that no seizure was ever made by any forces, officers, or agents of the said Republic of Mexico of said cotton, or of any part thereof, but that said claim was a sheer fabrication, and every material allegation in said statement and memorial contained was a falsehood, and that all the material testimony upon which said claim was allowed and said award made was false, and known to be so by all the witnesses giving and swearing to the same, and by the said Weil, when he caused the same to be exhibited as true to said commissioners. And that the whole of said award was obtained by fraud effectuated by means of false swearing, subornation of witnesses, and other false and fraudulent practices on the part of said Weil, his agents, attorneys, and assigns. ”
If the averments of that clause of the bill are established by a preponderance of the evidence, the complainants are entitled to a decree according to the prayer of the bill, but if not so established, the respondents are entitled to a decree authorizing and directing the distribution of the amount of the award still in the possession and custody of the United States.
The case of the United States v. La Abra Silver Mining Co. et al. (29 C. Cls. R., 432), presents many legal questions incident to this case, inasmuch as the controversy in that proceeding grew out of an award of the same commission, and was brought and determined in this court under a statute similar in its provisions to the statute authorizing this proceeding.
The constitutionality of the act of Congress and the conse *47 quent jurisdiction of the court were most seriously and ably contested in La Abra.case, but the court sustained the act as constitutional and proceeded to determine the merits of the controversy.
In this connection it is not necessary to enter into a discussion of many, if indeed of anjr, of the grave questions of constitutional law raised by the demurrer in the former case. This case was also most elaborately argued on demurrer upon the constitutionality of the act giving the court jurisdiction, on the ground that it was improperly approved by the President during the holiday recess of Congress; and in an opinion of the present Chief Justice the objection to the constitutionality of the act upon that ground was overruled. Weil Case (29 C. Cls. R., 523.) In this connection it is not necessary to enter into a discussion in detail of the grave questions of constitutional law raised by the demurrers in the former hearings.
It is said in the opinion of this court (The United States v. La Abra Silver Mining Co. et al., 29 C. Cls. R., 517, 520):
“By the act of 1892 the United States recognizes the fact of the claim of the company to the unpaid portion of the award, and by that recognition establishes in the company the existence of a right, which becomes the subject-matter of judicial cognizance by the fact that it is recognized; and by the force of the statute it passes from a mere grace as against the sovereign to a right susceptible of justiciable determination.
“ The recognition bj*- the United States of the claim of the company has imparted to it the qualities of property which, as between the company and the United States for the purpose, not of determining a political question but to ascertain a fact, is sufficient to support the judicial proceeding contemplated bjr the statute. Congress, by the act of 1892, declared a trust in the remaining funds for the purpose of determining the question of fraud urged by the Republic of Mexico, and conferred on this and the Supreme Court the judicial power of deciding that question. The statute provides, ‘to determine whether the award made by the United States and Mexican Mixed Commission in respect to the claim of the said La Abra Silver Mining Company was obtained, as of the whole sum included therein or as to any part thereof, by fraud effectuated by means of false swearing or other false or fraudulent practices on the part of said La Abra Company. ’ Congress having *48 recognized the claim, there was by the force of that recognition a justiciable right which might be made the basis of judicial jurisdiction, as it is by the provisions of the act. * * *
“The United States, by the act of 1892, suspended their relation to the fund as a sovereign, and by the terms of that act recognized aright in the-defendants, but subjected that right to the provisions of the statute which recognizes it. ” .
This is established by the decision of the Supreme Court in the case of La Abra Silver Mining Company v. The United States (175 U. S. R., p. 423), in which, by the very able opinion of the court rendered by Mr. Justice Harlan, the constitutionality of the act giving this court jurisdiction of La Abra case is sustained, holding that as to the subject-matter of the proceeding and the approval of the President the act is constitutional.
Upon the question of the right of the President to sign a bill during a recess of Congress from the 22d day of December, 1892, to the 4th day of January, A. D. 1893, the Supreme Court says:
‘ ‘ Whether the President can sign a bill after the final adj ournment of Congress for the session is a question not arising in this case, and has not been considered or decided by us. We adjudge — and touching this branch of the case adjudge nothing-more — that the act of 1892 having been presented to the President while Congress was sitting and having been signed by him when Congress was in recess for a specified time, but ivithin ten days, Sundays excepted, after it was so presented to him, was effectively approved, and immediately became a law, unless its provisions are repugnant to the Constitution.”
To support this theory of the law many cases are cited in the opinion tending to establish the right of the President to approve acts of Congress during the recess of Congress covering the Christmas holidays.
Upon the question as to whether the subject-matter of the act embraced matter bearing the imprint of a “ case” within the meaning of the clause of the Constitution conferring judicial power on the courts of the United States, the Supreme Court says:
“ Under the principles established in the cases above cited, the objections urged against the jurisdiction of the Court of Claims and of this court can not be maintained, if the present proceeding involves a right which in its nature is susceptible *49 of judicial determination, and if the determination of it by the Court of Claims and by this court is not simply ancillary or advisory but is tho final and indisputable basis of action by tho parties.”
Tho court, upon tho above question, proceeds at some length, quoting many cases, showing that tho recognition by tho act of 1892 of a legal right upon tho part of the company to receive the money in question, unless that right.was invalidated by fraud, imparted to tho proceedings tho qualities of a caso having tho element of a controversy susceptible of judicial determination. It is said:
“When tho La Abra Company asked the intervention of the United States it did so on the condition imposed by the principles of comity recognized by all civilized nations, that it would act in entire good faith, and not put tho Government whose aid it sought in the attitude of asserting against tho Mexican Republic a fraudulent or fictitious claim; consequently tho United States, under its duty to that Republic, was required to withhold any sum awarded and paid on account of the company’s claim if it appeared that such claim was of that character. As between the United States and tho company, the honesty or genuineness of tho latter’s claim was open to inquiry in some appropriate mode for the purpose of fair dealing with the Government against which such claim was made through the United States. We so adjudged in the Key Case. The United States assumed the responsibility of presenting tho La Abra claim and made it its own in seeking redress from the Mexican Republic. But from such action on its part no contract obligations arose with the La Abra Companj'- 4 to assume their frauds and collect on their account all that, by their imposition of false testimony, might be given in the awards of the commission.’ (Boynton v. Blaine, above cited”) . .
“These considerations make it clear that tho act of 1892 is not liable to the objection that it subjected to judicial determination a matter committed by the Constitution to the exclusive control of the President. The subject was one in which Congress had an interest, and in respect to which' it could give directions by means of a legislative enactment. The question for the determination of which the present suit was directed to be instituted was whether the award made by the commission in respect to tho claim of the La Abra Company was obtained, as to the whole sum included therein or as to any part thereof, by fraud effectuated by means of false swearing or other false and fraudulent practices on the part of *50 the company or its agents, attorneys or assigns. It can not, we think, be seriously disputed that the question whether fraud has or has not been committed in presenting or prosecuting a demand or claim before a tribunal having authority to allow or disallow it is peculiarly judicial in its nature, and that in ascertaining the facts material in such an inquiry no means are so effectual as those employed by or in a court of justice. The Executive branch of the Government recognized the inadequacy for such an investigation of any means possessed, and declared that Congress, by its ‘plenary authority,’ ought not only decide whether such an investigation should be made, but provide an adequate procedure for its conduct and prescribe the consequences to follow therefrom. The suggestion that the question of fraud be committed to the determination of a judicial tribunal first came from the Executive branch of the Government. Undoubtedly Congress, having in view the honor of the Government and the relations of this country with Mexico, could have determined the whole question of fraud for itself, and by a statute approved by the President, or which being disapproved by him was passed by the requisite constitutional vote, have directed the return to Mexico, the other party to the award, of such moneys as had been paid into the hands of the Secretary of State. It is also clear that in the absence of any statute suspending the distribution of such moneys the President could have ignored the charges of fraud and ordered the distribution to proceed according to the terms of the treaty and the award. But it does not follow that Congress was without power, no distribution having been made, to control the whole matter by plenary legislation.
“It has been adjudged that Congress, by legislation and so far as the people and authorities of the United States are concerned, could abrogate a treaty made between this country and another country which had been negotiated by the President and approved by the Senate. (Head Money Cases, 112 U. S., 580, 599; Whitney v. Robertson, 124 U. S., 190, 194; Chinese Exclusion Case, 130 U. S., 581, 600; Fong Yue Ting v. United States, 149 U. S., 698, 721.) It is therefore difficult to perceive any ground upon which to question its power to make the distribution of moneys in the hands of the Secretary of State — representing in that matter the United States, and not simply the President — depend upon the result of a suit by which the United States would be bound and in which the claimants to the fund in question could be heard as parties, and which was to be brought in a court of the United States by its authority, for the purpose of determining whether the La Abra Company, its agents or assigns, had been guilty of *51 fraud in the matter of the claim that it procured to be presented to the commission. The act of 1892 is to be taken as a recognition, so far as the United States is concerned, of the legal right of the company to receive the moneys in question unless it appeared upon judicial investigation that the United States was entitled, by reason of fraud practiced in the interest of that corporation, to withhold such moneys from it. Here, then, is a matter subjected to judicial investigation in respect to which the parties assert rights — the United States insisting upon its right under the principles of international comity to withhold moneys received by it under a treaty on account of a certain- claim presented through it before the commission organized under that treaty, in the belief, superinduced by the claimant, that it was an honest demand; the claimant insisting -upon its absolute legal right under the treaty and the award of the commission, independently of any question of fraud, to receive the money and disputing the right of the United States upon any ground to withhold the sum awarded. We entertain no doubt these rights are susceptible of judicial determination within the meaning of the adjudged cases relating to the judicial power of the courts of the United States as distinguished from the powers committed to the executive branch of the Government. ”
The court after holding that judgment authorized by the act of 1892 is final and conclusive as between the United States and the defendants, andAot ancillary or advisory, concludes upon the question of the constitutionality of the act by saying:
“We hold that the act of 1892 is not unconstitutional upon any of the grounds adverted to; that the Court of Claims had jurisdiction to render the decree in question; that such decree, unless reversed, is binding upon’the parties to this cause; and that this court, in the exercise. of its appellate power, has authority to reexamine that decree and make such order or give such direction as may be consistent with law.”
The award of the umpire, which constitutes the basis of the controversj', is as follows, to wit:
“In the case of Benjamn Weil vs. Mexico, No. 447, the umpire considers that the proof is amply sufficient that the claimant is a citizen of the United States, and he can not doubt that he is so and was so at the time of the origin of the claim. The claim arises out of the alleged seizure by troops under General Cortina of cotton, belonging to the claimant, for which no compensation has been granted by the Mexican Government. It is stated that' the occurrence took place *52 between Piedras Negras and Laredo on the 20th of September, 1864.
“The umpire considers that the facts put forward by the claimant are sufficiently proved, viz, that the cotton belonged to him; that it was seized and taken by troops belonging to the Mexican Government and under the command of General Cortina; that the place at which the seizure took place was between Piedras Negras and Laredo, which must therefore have been in' one of the Mexican States of Coahuila and Tamaulipas; and that the cotton, which was avowedly on its way to Matamoros for export, was seized on or about the 20th of September, 1864.
“These facts are not disproyed by evidence of the part of the defense. The argument of most weight which has been suggested by the latter is that all communication with points occupied by the enemy was forbidden. But there is no proof that any of the territory through which the cotton had passed, or was intended to pass, was occupied by the enemies of the Mexican Government. It is true that the States of Coahuila and Tamaulipas were under martial law; but that state of things did not justify the Mexican authorities in seizing the goods of private persons and neutrals without giving them compensation; or if they thought it necessary to seize the cotton in order that it might not fall into the hands of, or even pay duty to, the enemy, they were still bound to indemnify its owner. The umpire has been unable to discover any proclamation or other manifesto by the Mexican Government to the effect that either Coahuila or Tamaulipas was occupied by the enemy, and it is a historical fact that the city of Mata-moros was first occupied by the French forces on the 26th of September, 1864.
“The umpire is, therefore, of opinion that the claimant was committing no illegal act in transporting his cotton through Coahuila and Tamaulipas, with destination to Matamoros, on the 20th of September, Í864, and that as it was seized by Mexican authorities, for whatever reason it may have been seized, the Mexican Government is bound to indemnify the claimant.
“The claimant asserts that there were 1,914 bales of cotton. The witnesses agree that there were not less than 1,900, which latter number the umpire will therefore adopt. The average weight of each bale is shown to be 500 pounds and the value 35 cents per pound. But with regard to the value, it must be remembered that the cotton was still a long way from Mata-moros when seized, and that there is always some risk of damage being done to it during the journey. The umpire therefore thinks that it will be fairer to put the value at 30 cents the pound.
*53 “The umpire therefore awards that there be paid by the Mexican Government on account of the above-mentioned claim the sum of two hundred and eighty-five thousand Mexican gold dollars ($285,000), with interest at 6 per cent per annum from the 20th of September, 1864, to the date of the final award.
' " ' “EDWARD THORNTON.”
After the rendition of the award, the counsel for Mexico made a motion for a new trial based upon certain affidavits, but the rehearing was denied as follows, to wit:
‘ ‘ In case No. 447, ‘ Benj. Weil v. Mexico] the agent of Mexico has produced circumstantial evidence which if not refuted by the claimant would certainly contribute to the suspicion that perjury has been committed, and that the whole claim is a fraud. For the reason already given, it is not in the power of the umpire to take the evidence into consideration; but if perjury shall be proved hereafter no one would rejoice more than the umpire himself that his decision should be reversed and that justice should be done.”
It is insisted b3r counsel for the respondents that the award makes a prima facie case for them; that the burden of proof is upon the complainants to show that the award or a substantial part thereof was obtained by fraud, effectuated bj" means of false swearing or other false and fraudulent practices upon the part of the decedent, his agents, attorneys, and assigns.
In this connection it is proper for us to cite what the court said on the demurrer in the decision of La Abra Case, as quoted and decided in that case (32 C. Cls. E., 483-484):
“The case is to proceed upon ‘the proof admitted by the mixed commission in connection with such competent evidence as may be offered by either party,’ and the court is to consider the whole evidence in arriving at a conclusion as to whether the finding of the commission was procured by fraud on the part of the company. (La Abra, 29 C. Cls. E., 521.)”
The court further said:
“If the court, upon an examination of the cause, in the light of the original proof and such competent evidence as may be offered, should come to the conclusion that the award by the commission was obtained through fraud effectuated by false swearing or other false and fraudulent practices of said company, then it will be the duty of the court to decree that the company, its legal representatives and assigns, be barred and foreclosed from all claim to the money, or part thereof, *54 so paid by the Republic of Mexico; and upon the faith of that finding (subject to an appeal to the Supreme Court of the United States) the President is authorized to return to the Government of Mexico the money still remaining- in the custody of the United States. * * *
“If the court should decide that no fraud or fraudulent practice was perpetrated by the company in procuring the award, then the decree would specifically find that fact, which would be in law a finding for the company, and upon that finding in form of a decree it would be the duty of the Secretary of State to pay the money to the company or its assignees.
“The respondent, having an award of the umpire, is entitled to the full benefits of that award, unless it is shown by sufficient proof that within the meaning of the statute giving this court jurisdiction the award or some substantial part thereof was obtained ‘ bjr fraud, effectuated by means of false swearing or other false and fraudulent practices on the part of said company or its agents, attorneys, or assignees.’ The burden is upon the complainants to satisfy the court that the award made by the umpire was the result of fraud as indicated by the statute. We are not sitting as a court of review to determine whether, upon the proof offered and admitted, the award is to be sustained or justified by the weight of testimony, but whether it was procured by false testimony or fraudulent practice upon the part of the respondent. We are not to determine the question as to whether the umpire found against the weight or great weight of the evidence, but whether the award is the result of fraud and perjury upon the competent testimony.”
This case being in its legal elements the counterpart of La Abra case, the same rules of law are applicable.
The counsel for respondents make the point of negligence and laches on the part of the Republic of. Mexico in not producing evidence before the commission, and that such negligence and delay ought not to prejudice the rights of their clients.
The same point was made in La Abra-case, and on that subject this court said:
“It is also insisted on the part of the respondent that, this proceeding being in the nature of a suit in equity based upon the judgment of a tribunal having complete jurisdiction of the parties and subject-matter, the complaints must show such a state of facts as would justifjr a court in granting a rehearing or new trial; that if the party in interest, to wit, the *55 Government of Mexico, bas been guilty of laches and want of diligence in the presentation o‘f its defense, it is now too late for it to avail itself of any defense which by the exercise of proper diligence might have been presented to the joint commission. The question of diligence upon the part of Mexico is not, as we conceive, before this court. That question ivas passed upon by Congress in the passage of the law giving us jurisdiction to determine the controversy on the questions of fact, subject to the rules of evidence applicable to the character of the inquiry arising upon the record. We simply come to a conclusion as to' the material inquiries arising under the statutes on the evidence properly before us, and upon that conclusion base the legal result in the form of a decree.”
The counsel for the complainants call the attention of the court to the fact that while the matter was before Congress, preliminary to the passage of the act of 1892, the respondents (unlike the claimants in La Abra) failed to present to the consideration of Congress any evidence in reply to the evidence produced by Mexico on the motion for a new trial before the umpire, and also to the report of the committee accompanying the bill. While it may be proper to consider the fact of the failure to produce evidence as tending to show the bona-fíeles of the claim, we do not regard the statements of the committee on a matter of fact competent in the determination of the question as to whether the decedent was the owner of the cotton and lost it as alleged. We can not go behind the act of our jurisdiction to enquire into matters affecting the right of the Republic of Mexico to' the relief intended to be given bj7 the terms of the statute.
Under the second section of the act of 1892, the court is given full jurisdiction to hear and determine the case upon the bill of the Attorney-General, according to the principles of equity and justice, and to enforce the same by appropriate process according to law and the rules of the court. It is to be a hearing on the merits; and not to be decided and determined upon a question of estoppel arising from the negligence of parties.
“Sec. 2. That full jurisdiction is hereby conferred on the Court of Claims to hear and determine such suit and to make all interlocutory and ffnal decrees therein as the evidence may warrant, according to the principles of equity and justice, *56 and to enforce the same by injunction or any proper final process, and in all respects to proceed in said cause according to law and the rules of said court, so far as the same are applicable. And the Secretary of State shall certify to the said court copies of all proofs admitted by the said mixed commission on the original trial of said claim, and the said court shall receive and consider the same in connection with such competent evidence as may be offered by either party to said suit.”
The issue is, had the decedent the cotton as alleged and was it taken from him by the acts and depredations of the soldiers or subjects of Mexico?
It is impossible in the compass of an opinion to comment uj)on all of the evidence in a case so voluminous; so that we are compelled to select such portions of the testimony as are material and deduce therefrom the probable truth of the case, omitting nothing which might contradict the conclusion reached upon the whole record.
The decedent, Benjamin Weil, at the time of the alleged loss was a naturalized citizen of the United States, residing in the city of New Orleans. Before the war for many years he resided in Alexandria, Louisiana, where he carried on a mercantile and trading business, both in his individual capacity and as a member of the firm of Isaac Levy and Company, composed of Isaac Levy, Marx Levy, Jacoby Levj7", and Benjamin Weil. This firm did what might be called a large business for that section; and until about the first of March, 1863, were engaged, as a part of their business, in the cotton trade. The firm of Isaac Levy and Companjr was formed in 1855 or 1856, and continued to do business until March, 1863. when it was consolidated with the firm of Bloch, Firnberg and Company, and the name and style of Levy, Bloch and Company. The main purpose of the new firm was to engage in the exportation of cotton and the importation of goods and supplies for the use of the Confederate army.'
A short time before the formation of the consolidated company the decedent entered into a contract with Governor Moore, of the State of Louisiana, to sell to the Confederate authorities supplies in exchange for cotton, and although the contract was in the individual name of Weil, it was intended for the benefit of the firm of Isaac Levy and Company.
*57 The new companj' commenced business in March, 1863, and continued in existence until December, 1865, as is shown hereafter. . .
The agreement to consolidate the two firms, which composed the house of Levy, Bloch and Company, was made on the ninth of March, 1863; and from that time forward to the close of the time in which it is alleged the shipment of the cotton in dispute was made, a correspondence was carried on between the decedent on one side, and some of the members of Levy, Bloch and Company, principally b}r Mr. Loeb, in which mention is made of conditions and circumstances which tend to show whether the decedent was during that period engaged in connection with his business for the firm, or in the business of carrying on very extensive operations' on his own account. Those letters commence on the 19th day of March, 1863, and end on the 27th day of October, 1861, all of which are set forth in Exhibit A of the bill.
The decedent seems to have been a faithful correspondent in the communication of many details affecting the interest of Levy, Bloch and Company, and the correspondence indicates a most scrupulous regard for the interest of his partners.
The testimony of Hite, who swears he was the agent of decedent in the purchase and shipment of the cotton, does not disclose the exact period in which he, as the agent of the decedent, was engaged in the purchase and collection of the cotton at Alley ton; but he sajrs the cotton was prepared and shipped some time in May, 1861; but Shackleford swears it was about the first of September, 1861.
The correspondence of Weil, which we note in this connection, commencing as it does in April, 1861, covers the time stated by both witnesses, Hite and Shackleford.
The first letter, dated Houston, April 11, 1861, is from Weil to Loeb, and shows that at that time Weil was in Texas on his way to Alexandria, and not in Mexico.
The next letter from Weil is dated May 30, 1861, from Navasota, to Loeb. The date of this letter is after the time that the cotton was shipped by Hite, according to his testimony. In that letter Weil speaks of a train, the interference of the State with the cotton bureau, and his determination to go to Shreveport. The town of Navasota is north of Hous *58 ton and Alleyton about one hundred miles. On June second he again wrote from Navasota; on June 17, 1864, he writes from Shreveport; on July 9, 1864, from Opelousas; on July 14, 1864, from Alexandria; on July 21, from same place; on July 29, from Opelousas; September 5, from Alexandria; September 10, from Shreveport; September 15, 1864, he addresses General Kirby from Shreveport a communication as to the seizure of certain cotton by the authorities of the Confederate States, which he claims was in violation of his contract with the State of Louisiana which he and his partners have, as he says, faithfulty fulfilled.
It will bo noted in this connection that the cotton was shipped from Alleyton by Loeb for Weil and consisted of 83 bales. •
On September 20 he writes to Loeb from Shreveport, in which he mentions an application for a permit to ship 32 bales of cotton, and sa3rs, in substance, that he can not get permit unless it is for goods furnished the State of Louisiana. On September 22 ho again writes from Shreveport to Jenny; on September 23 he writes from same place to Solomon; on the 18th day of October he furnishes a statement for some purpose of his proceedings since the fall of New Orleans, which is dated at Shreveport, Louisiana. It is not necessary to pursue this line of communications further. It is important in showing that from the time of the alleged shipment of the cotton in May, 1864, until several months after its alleged seizure he was in the State of Texas, and Louisiana, most busily engaged in the interest of Levy, Bloch and Company, and that he ceased to have sufficient interest in his individual enterprise to induce him to remain in or return to Matamoras.
The letters to which we have called attention wore written at the time they bear date, and do not depend upon the testimony of witnesses; they establish a condition which may be assumed to import absolute verity. Witnesses may fail to recollect correctly, or they may be induced bjr the allurement of gain to commit perjury in the fabrication of fraud and wrong; but contemporaneous writings made at a time when there was no inducement to falsify or mislead are entitled to great credit. The whereabouts of Weil from April, 1864, to *59 the time of tbe alleged capture, and letters from him to Ms partners as to the business of the firm are most important as tending to show whether the claim is a fraud, as alleged by the complainants, or a bona fide loss, as insisted by the respondents.
The alleged outlay on the part of the decedent of from two to three hundred thousand dollars, all of which was paid in greenbacks and gold, makes it necessary that an enquiry be made into the pecuniary condition of the decedent at and during the period covered by the alleged purchase and transportation of the cotton. The testimony of Loeb shows that upon the organization of the firm of Levy, Bloch and Company the members of Bloch and Company were disappointed in the financial resources of Isaac Levjr and Company. It seems they had no ready money, and put into the new firm their shares of the common stock, mostly in the kind of propertj'- in which the firm intended to deal.
The evidence taken at the home of Weil tends to show that he had the reputation of being a man of considerable wealth, but nothing to indicate that he was a man of large moneyed resources. The proof upon the part of the respondent, while it tends to show that Weil had good credit, does not show that he made any loans or that he was pressed by creditors after the alleged failure of his cotton undertaking.
He went to Matamoras sometime in June, 1863. On August 8,1863, he writes to his partner and friend Loeb, in which he gives the condition of his situation. It would seem from the tpne and tenor of this communication that .the consolidated company was limited in the resources of its ready money. He says, “I have not settled yet, but there will be nothing left after paying what money Marx borrowed and other expenses. There will be nothing left and I have to live very poorly to make both ends reach. Money is scarce here and goods cheap; board high and bad.” In that connection, on account of the condition of the Confederacy, he advises to ship cotton as fast as possible. He says Confederate money is not available. “If you get money send it on.”
His partner, Loeb, is examined on the point of his pecuniary ability at the time he was stationed in Mexico. The *60 witness’s attention was called to a letter of Weil’s, in which he said “I am in debt $225, which I shall not pay before I receive funds from some of you.”
Witness said:
“ Question. I notice in that letter, toward the end, the following sentence: ‘I am $225 in debt, which I shall not pay before I receive funds from some of you.’ Do you remember remitting to Mr. Weil in reply to that request for funds?
“Answer. I remember remitting at different times, but I would have to refer to books to see if I remitted then.
“Question. I call your attention to the sentence, two or three sentences, before the close of the letter, as follows: ‘ No Zeeman, no Marx. The whole of last week there was no Yankee fleet at the mouth.’ Please explain that sentence, ‘ No Leemcm and no Marx.’
“Answer. That must have been the schooner Zeeman, that had some cotton, and very likely Marx was on board of that schooner, and he found it very strange that they did not come in, as there was no Yankee fleet there at that time.
“Question. You mean a schooner coming to Matamoras with cotton?
“Answer. No; merchandise. The Zeemcm was to go to Tampico.
“Question. Prom where?
“Answer. The schooner left the mouth of Lake Charles.
“ Question. She was to go to Tampico with what cargo?
“Answer. With a cargo of cotton, which the firm of Bloch, Firnberg & Co. put into the firm of Levy, Bloch & Co.
“ Question. And with what was she to return?
“Answer. With a cargo of assorted merchandise, and Marx was probably on board of her.”
Marx Levjr testifies that in the spring of 1864, while W eil was at Matamoras he was without individual means, that he had to supply him with money, and in May, 1864, he furnished him the means to make a trip to Texas, and also in June.
In the consideration of the facts, a brief statement of certain conditions arising from undisputed facts tends to enlighten the mind in the determination of the question whether the decedent, as is alleged, was the owner of 1,914 bales of cotton on the 20th of September, 1864, and that the same was seized within the territory of Mexico by troops belonging to the Mexican Government.
If it is true that such a seizure was made it was a most fla *61 grant violation of the rights of the decedent, and involved in him the loss of a very large amount of money.
The evidence tends to show, and such was the finding of the umpire, that the bales would weigh on an average' of 500 pounds, and at the time and place was worth at least 35 cents per pound, aggregating the sum of $285,000, for which an award was allowed.
The depredation as alleged happened in September, 1864, and the claim was first called to the attention of the United States Government at the time of its presentation to the State Department in March, 1870. While it is alleged in the claim that the decedent solicited the release of his property, he stated “ I have never laid this claim before either the United States or Mexican Governments asking payment thereof.”
The train, as alleged by respondents, necessary to transport 1,914 bales of cotton weighing 500 pounds each would require nearly two hundred wagons with at least eight mules to the wagon and a force of men not less than two hundred, and when in motion would require a space of from four to five miles. In order to equip a train of that magnitude a great amount of capital would necessarily be emplojmd in the payment of the hire of teams and hands, assuming that the teams were hired, and a much larger amount if the teams were purchased.
An examination of the evidence as to the financial condition of Benjamin Weil at the commencement and during the war, is therefore most expedient as tending to show his ability to manage a transaction involving the requirement of the amount of capital necessarily employed in the purchase and transportation of the large amount of cotton involved in this claim.
The consolidated firm of Levy, Bloch and Company continued until the 19th of December, 1865, at which time it formally dissolved by a written agreement by which it' was in substance agreed that the parties mutually acquitted and discharged each other from all liability incident to or growing out of such partnership.
As has been said the firm of Levy, Bloch and Company was organized for the purpose of carrying on a large trade in goods and the purchase of cotton to be shipped out of the United States by running the blockade then established - by the Federal Government of' the ports of the Southern States. Weil *62 and bis partner Levy had an agreement with the Confederate Government to purchase a large amount of cotton in payment of stores and supplies which they agreed to furnish the agent of the Confederate Government, and that agreement was to pass to the new firm.
It does not appear that the united resources of ■ the firms were sufficient to accomplish the task of buying and transporting in the summer of 1864, the amount of the alleged loss in the territory of Mexico.
By an arrangement between the partners of the new firm they were to be stationed at different points in Louisiana and Texas, but Weil was to go to Europe as representative of their interest. For reasons satisfactory to himself and his partners he did not go, but remained in and near Houston, Texas, until June, 1863, when he went to Matamoras, Mexico. During his stay in Texas he was most diligent in attending to the interest and business of the company, and in good faith performed his duties as a member of the consolidated firm.
It may be noted in this connection that the alleged purchase and ownership of the 1,914 bales of cotton without the knowledge of his partners were in violation of his trust as a partner; but the fact that he may have perpetrated a wrong on the joint interest of the partnership will not inure to the benefit of the Mexican Government, if in fact he was the owner of the cotton at the time of the alleged depredation.
Some time in June, 1863, Weil, having abandoned his trip to Europe, is found at Matamoras representing the firm of Levy, Bloch and Company. In the latter part of 1863 or early part of 1864, he made an agreement with Jenny and Company by which he was to sell and deliver to the State of Louisiana goods amounting to $60,000 for which his firm was to receive the sum of $12,000, being 20 per cent commission.
The theory upon which Weil made the claim an individual one before the commission, and upon which it is now defended, is that without the knowledge and consent of his copartners he carried on in the years 1863 and 1864 a clandestine trade in cotton, in which he accumulated in his own right the 1,914 bales, which were captured as alleged.
The amount of the alleged taking by the Mexican soldiers was very much in excess of what was purchased and delivered *63 by the united firm of Levy, Bloch and Company, and the result of the individual effort of Weil in the purchase and collection of cotton was more successful than the combined efforts of Weil and his copartners.
■ Loeb, one of the firm of Levy, Bloch and Companjr, was assigned to Houston, Texas, at which place he remained for three years, commencing shortly after the formation of the partnership in March, 1863, to some time in 1866. Weil remained with him several months prior to going to Matamoras, and they acted in concert in the business and interest of the consolidated firm. It is insisted by the respondents that the evidence shows that the cotton was collected at Alleyton, which is a point on the railroad about sixty or seventy miles from Houston, and that during the latter part of 1863 and the first part of 1864 the cotton was purchased by Weil and his agents, baled and transported to the point where it was captured or stolen by the Mexicans.
The purchase and collection of the amount of cotton in controversy at the point indicated necessarily involved a great amount of labor and the consequent employment of not only a’ number of agents in the purchase, but hands and teams in the collection of the cotton and its preparation for transportation and sale. The claim on the part of the respondents that the cotton was collected at Alleyton and started from that point makes it important that we should consider most carefully the evidence tending to show that it was so collected in connection with the evidence tending to show that it was not collected and transported as alleged.
The principal witness for the respondents is George D. Hite, who made an affidavit on the 12th of March, 1872, to be used as evidence before the commission. The substance of that affidavit is that in the year 1864 he acted as the agent of Weil in the purchase of cotton; that as such agent he purchased the cotton in controversy, paying for it in greenbacks and gold; that the cotton when purchased was sent to Alley-ton, whence it was shipped in May, 1864, through Texas, crossing the Rio Grande into the territory of Mexico, where it was captured by troops under Cortina in the service of the Jaurez Government; that the train conveying such cotton consisted of 190 wagons; that the cotton belonged to Weil, *64 and tbat bo was the largest and wealthiest operator in the country. He also states that as soon as he started the train in May he left the employment of Weil and proceeded ha Matamoras on business of his own, but that he met the train and assisted it in crossing- the Rio Grande; that from Alleyton to the point where it crossed is about 700 miles, and that the train would travel about eight miles per dajn
Samuel B. Shackleford, on the 17th of February, 1872, made an affidavit, in which he, in substance, states that in 1864 ho was in the clothing department of the Confederate Government; that about the first of September, 1864, he was in Alleyton, Texas; that Weil was taking out a large train loaded with cotton to “penetrate the territory of the United States of Mexico toward Laredo;” that it was loaded with about two thousand bales; that he knew of the business, and was in contact with the agents and clerks every day; saw drafts drawn by Weil and payments made for the use of teams; that the price of cotton was about forty cents per pound, and that the bales would weigh 500 pounds each; that he saw the trains in Mexico, knew of its capture, and the demand of Weil in person for the return of his cotton and teams.
The affidavit of John M. Martin was taken on the 26th day of July, 1870, in which he testifies, in substance, that he was present about the 20th of September, 1864, in the territory Mexico when a train of cotton belonging to Weil, having in its possession about 1,900 bales of cotton, was captured by the Mexican soldiers.
John J. Justice makes affidavit February 7, 1870, in which he states that he was well acquainted with Weil; that on the 20th of September, 1864, he was with a team belonging to Weil between Piedras Negras and Laredo, in Mexico, and that the train was captured by the Juarez party of the Mexican States; that there was 1,914 bales of cotton, weighing 500 pounds each, worth thirty-five cents per pound.
The respondents have introduced the evidence of Jesse Sumpter, who during the war and now resides at Eagle Pass, and who was at the time of his giving his evidence “inspector of United States customs” at that point. In 1864 he was the Confederate customs inspector at Eagle Pass. Knew Benja *65 min Weil; knew him to be in cotton trade; Weil had cotton; how much did not know; supposed to be 2,000 bales; part of it at Eagle Pass; crossed 300 bales for Weil to Mexico; repaired 75 bales marked C. S. A., at one end, and at other B. W. Weil, who was largely interested in cotton at the time, said to have owned 2,000 bales. Weil’s cotton went to Mexico; rumor that it was seized by Cortina; did not see the cotton leave Piedras Negras; was understood at that time that the Weil cotton was sent down the river; heard of the seizure at the time; never heard of Hite; no interest in claim; never knew anyone but Weil; he employed me to transport 300 bales and to repair 75 bales; I was paid my charges. I saw on the Mexican side 2,000 bales of cotton marked C. S. A. and B.W.; cotton transported in carts and wagons; Cortina was seizing cotton belonging to Americans; he was a desperate character.
John H. Clark testifies that he was an officer in the C. S. A., stationed at Brownsville in 1864, and that during that year he saw Hite at Matamoras and Brownsville, but upon cross-examination, after having his recollection refreshed by a written document, he swears that he saw Hite in 1865 instead of 1864, and that in his direct examination he was mistaken. His attention had been called to the matter by General Slaughter, who had been employed to collect evidence in the interest of the Republic of Mexico.
B. J. Pridgen testifies that he was connected with the cotton bureau of the Confederacy during’ the year 1864; that as such agent he assisted in the transportation of cotton consigned to Captain Lee of the C. S. A., at Eagle Pass, marked “ C. S. A.,” and “ B. W.” The cotton was detained at Eagle Pass by some process and some of the cotton sold to pay expenses. The cotton had been transported from Alleyton by teams hired ■ by the Confederate Government. The cotton was secured from George Witting at Alleyton. On cross-examination he says: I loaded at Alleyton cotton known as the Weil cotton; contracted with a • number of teamsters; I think it was between 1,500 and 2,000 bales; the last I saw of it was at Eagle Pass awaiting permission to be shipped to Mexico. The “State agents were doing all in their power to raise freight money for the cotton.”
*66 We have quoted in substance the evidence of the principal witnesses offered on the part of the respondents as to the purchase and possession of the cotton at Alleyton, and its alleged capture in the territory of Mexico.
The testimony on the part of the complainants as to the alleged purchase of tJie cotton and the shipment of it from Alleyton is to be found in the deposition of Loeb, the partner of Weil, and other persons who lived in Alleyton and engaged in business.
Mr. Loeb was, as has been stated, pne of the consolidated firm of Bloch, Levy and Company, and was stationed in the interest of that companjr in Houston, Texas, distant about sixty miles by rail from Alleyton. Alleyton in 1864 consisted of forty or fifty houses, with population of between three and four hundred.
The district of country surrounding Alleyton was within the compass of the territory in which it was expected that Loeb would do business for the firm of which Weil was a partner. He testifies that he did business in the purchase of cotton at Alleyton; that during the year, in 1864, he was probably at that place ten different times; that he was there in May, 1864, when it is stated by Hite that he started the train for the Rio Grande; that he never knew of Weil being there during the year 1864; that he recollects distinctly of being in Alleyton between May and September; that the firm was not collecting cotton at Alleyton except what he (Loeb) had control of, which was about 150 or 200 bales, which was shipped to Matamoras under the instruction of the witness; that the firm shipped other cotton, about 85 bales; that he first became acquainted with Hite in January, 1865, when he employed him for a space of seven months.
James C. Baldwin testifies for the complainants that during the year 1864 he resided in and did business as J. C. Baldwin and Company, engaged in the business of repacking and shipping cotton from Alleyton to the Rio Grande; that he knew George D. Hite, but is not certain when he became acquainted with him; that he never knew of his being engaged in the cotton trade to any extent; that he never knew of him preparing or shipping cotton; that he never knew or heard of *67 the train of Weil leaving Alleyton; that his firm handled seventy-five per cent of the cotton which was shipped from that point.
John Rosenfield, who during the year 1864 carried on an extensive business as a cotton commission merchant in Alley-ton, testifies in substance that he lived there from 1859 to 1867; that during that time he did not know of Weil or Hite; may have heard the name of Weil; that the largest train he ever knew of at Alleyton was twenty-two wagons, and that was considered a very large train; that it was difficult to get wagons because of the impressment of the Government; that it would take some time sixteen mules to the wagon; that the only press at Alleyton was 'the Baldwin press. In his corrected testimony he states he was absent about two-months in the spring; that he never heard of Weil and Hite operating in cotton; heard of and knew Loeb.
H. Kalon, who kept a hotel in Alleyton in the year 1864, testifies that he has no recollection of Hite or Weil; that twenty wagons would be a large and unusual train; that he never saw or heard of a train of 190 wagons.
W. S. Delaney, a lawyer, residing at Columbus, three miles distant, says that Alleyton was a center of cotton business; that many trains were from ten to twenty wagons; that he sold corn to trains, and that he never saw or heard of a train of 190 wagons passing through Columbus, and all the cotton trains going to Mexico passed through Columbus.
The testimony of these witnesses bears directly on the question of fact'whether Weil had the cotton at the initial point of the transportation,.and if it should be found that he started no cotton, but that the train of 190 wagons and the 1,914 bales is a fabrication and fraud upon the part of Weil and his witnesses, that most effectually disposes of the alleged taking by the Mexican soldiers and the liability of the Republic of Mexico to reimburse the respondent.
Hite says the train consisted of 190 wagons, averaging eight mules to the wagon, and left Alleyton in May, 1864, and that . after preparing and starting the train from Alleyton he left the employment of Weil and proceeded directly to Matamoras; but having, business up the Rio Grande in September, 1864, *68 “I met the train and cotton at a point where it crossed the Rio Grande, 160 miles above Brownsville, and assisted in crossing it into Mexico.”
If we assume the statement of Hite to be true, the train of 190 wagons which left Alleyton in May did not cross the Rio Grande until over ninety days from the time of its departure from Alleyton. The distance from Alleyton to the point indicated by the testimony of Hite is about 340 miles. The point of crossing was selected, as Hite says, because “for the sake of better roads there afforded.”
The location of Hite in the fall of 1864 is indicated by a letter from Weil and Jenny, bearing date October 27, 1864, dated at Shreveport. It is shown by that letter that on that date he was in the employ of the Confederate Government, and that Weil and Jenny desired him to be detailed in connection with their cotton transaction.
In the testimony of Captain Wise, of the C. S. A., it is shown from the best recollection of the witness that Hite was at Shreveport during the whole of the year 1864 in the employment of the quartermaster department under the supervision of Captain Wise. To confirm the recollection of the witness his attention is called to a letter which he wrote as to the whereabouts of Hite during the year 1864.
The testimony of General Boggs is very important upon the point as to the location of Hite during the year 1864. He was chief of staff of the trans-Mississippi department stationed at Shreveport.
The substance of his testimony is that Hite was in and about Shreveport during the year 1864, and that owing to the condition of the military service of the Confederacy and the necessity of Hite’s service as a steamboat man in the employ of the Government, he could not have absented himself for the space of time required to buy and ship the Weil cotton. In the deposition of the witness his attention is called to an affidavit which he made on the 17th of August, 1876, on the motion for a new trial. The witness reasserts the substance of that affidavit, which is as follows:
“17th August, 1876.
“ Personally appeared before me, John W. Corson, a notary public, W. R. Boggs, who made oath and says:
“I was chief of staff of General E. Kirby Smith, com *69 manding what is known as the trans-Mississippi department of the Confederate States of America; that a brigd. general C. S. A.; that I was at Shreveport, Louisiana, headquarters of the department, throughout the year 1864; that I knew George D. Hite, and that he was there from time to time throughout the whole year, that is to say, that I saw him frequently and continually throughout the year aforesaid. Also, I do not know Benjamin Weil; that I never heard of any seizure of cotton by the Mexican authorities or others. Any seizure of cotton would, I think, have been heard of by me in my position.
“W. B. Boggs. ■
“.Subscribed and sworn to before me this seventeenth day of August, A. D. 1876.
[SEAL.] “JOHN W. CORSON,
‘ ‘ Notary PulMo.”
The testimony of General Boggs on the probability of Hite being engaged in the cotton trade in 1864 is as follows:
“11. Question. Was it or not probable that George D. Hite could have gone into Texas in 1864 and there collected some 1,900 bales of cotton and had the same transported across the Bio Grande, and have also gone to Matamoras on his own private business without a permit or detail from the military department of which you were the chief of staff?
_ ‘ ‘Answer. Not only improbable, but, in my opinion, vmprac-ticccble for him to have done so without my knowledge.
“12. Question. Is it or not admissible for me to infer from what you have said that the States within your department were in something of the predicament of a military camp ?
‘ ‘Answer. In my opinion they were absolutely so.
“13. Question. Was or not every citizen in your department of military age regularly enrolled as a soldier?
“Answer. There were cases where physical disability exempted a man from regular enrollment as a soldier, but they had to be unfit for almost any duty, and pronounced so by a board of medical officers (p. 198).”
There are several other witnesses who testify that during the year 1864 Hite was living with his family in the town of Shreveport, some of them having most intimate relations with him.
On the 20th of August, 1864, Hite executed an acknowledgment of an instrument in writing before the mayor of the city of Shreveport, which appears in the record, page 403; and from that it is shown he was in Shreveport at the time the instrument bears date of execution.
*70 The respondents have taken the evidence of several witnesses tending to show that Hite was away from Shreveport some of the time during the year 1864. His nephew testifies that he was awajT “more or less during the year, and from his conversation he inferred that he was in Texas an 1 Mexico, and that he has heard him speak of W eil and the seizure of cotton.” The conversation as to Weil and the cotton was years after the war.
In connection with the testimony of Hite as tc the purchase and shipment of the cotton, the testimony of A. G. McClung, who at the date of his deposition, in 1897, was a resident and practicing lawyer at Fort Worth, Texas. Mr. McClung has had no connection with any of the parties to this proceeding and is wholly disinterested in the result of the litigation.
In the year 1864 he was engaged on the Rio Grande in the purchase and shipment of cotton for the Confederate Government, and as such agent had a most extensive knowledge of the cotton trade in southern Texas, and especially along the Rio Grande, being stationed at many points during the year 1863, and 1864, from Eagle Pass to Brownsville. He had ■not only a knowledge in detail of the condition of the cotton market, the means of transportation, but his relations to the Confederate Government enabled him to know the policy and plans of the Confederate authorities in dealing with private parties engaged in the cotton trade.
According to his testimony he was a large operator, contracting for immense amounts of cotton and superintending its transportation to market in the interests of the Confederacy. His field of operations must have embraced the same territory in which it is alleged the cotton in controversy was purchased and through which it was hauled; yet he testifies that he never heard of Weil as a cotton buyer, nor did he hear of the train of 190 wagons alleged to have been used in the transportation of the Weil cotton.
All the witnesses who have testified for the respondents as to the existence of the cotton and the capture of train unite in saying that it was substantially one train moving in compact forward, and from the time it left Alley ton until it was broken up by Cortina it remained intact.
The testimony of McClung, in common with the testimony of the other witnesses who lived in the cotton country and *71 were acquainted with business during the year 1864, shows that such a train would be the most extraordinary occurrence that could possibly happen in the cotton trade. The consensus of testimony is that 20 wagons would be a very large train, and the most of them testify that they never saw even that many.
McClung says he was on the Rio Grande in 1864; that about that time he went from Laredo to Rio Grande City, and that it was not possible for a train of 190 wagons loaded with cotton to cross the Rio Grande without being seized; that all cotton passed through San Antonio, and could not go beyond that point without a permit. One hundred and sixty miles above Brownsville would be at a point eighty miles below Laredo, where there was no custom-house or other facility for passing over the Rio Grande.
The witness at the time of the alleged seizure was in close contact with the cotton policy of the Confederacy, and is enabled to state fully as to the safeguards thrown around the cotton trade by tho department and the officers charged with the execution of the Confederate policy.
The distance from Alleyton to a point on the Rio Grande 160 miles above Brownsville is about 340 miles and not seven hundred, as testified to by Hite, and no public road leading from Alleyton to that point. The roads, as stated by McClung, from San Antonio were to Eagle Pass 160 miles; to Laredo 60 miles; to Rio Grande City 200 miles, and to Brownsville 320 miles. The witness states that he never heard of the seizure of such a train and that the Mexicans were not in the habit of making seizures; that a train of cotton teams ought to make the distance between Alleyton a'nd the point indicated from thirty to forty days, and that a train of that magnitude could not be handled even if undertaken. •
In this connection it is proper to cite one very important act of the Confederate authorities affecting the cotton trade during the summer of 1864, in the State of Texas:
“ Headquarters
“Trans-Mississippi Department,

“Shreveport, La., Jtmelst, 1864-“To the citizens of the TmnsrMississippi Department:

“I have deemed it my duty to issue a general order directing the purchase, and, if necessary, the impressment, of one- *72 half the cotton in this department, to supply the pressing-wants of our armies in the field.
“Your soldiers are the sole reliance for the defense of the country from invasion and desolation. They have recently furnished you a signal instance of their willingness and ability to defend your homes. Without munitions of war, clothing, and medicines, they can not be kept in the field. These articles can be obtained only by importation. • Cotton is the sole means of purchase. In the same lofty spirit of patriotism which leads your sons and brothers to offer their lives for your protection, will you not sell to the Government the only product by which their valor can be made effective against the public enemy?
“The impressment of cotton will be avoided, if possible. But supplies for the army must be had. It is left with you to determine whether, for the preservation of your homes, you will force the Government to resort to impressment.
, “E. Kirby Smith,
“ General, Oommcmding.”
With an order of that kind in force from the 1st of June, 1864, to the close of the war, it is not difficult to see with what vigilance the public authorities would guard the interest of the Confederacy in the prevention of any and all fraud upon the policjr of the Confederate Government. The purpose of this order was carried out, it is to be presumed, in the same spirit in which it was conceived and promulgated by the head of the department. In this connection it may be noted that as to the cotton which the decedent purchased in violation of his trust as a partner of Levy, Bloch and Company he had no difficulty with the agents of the Confederate Government; but as to the cotton he purchased and shipped for Levy, Bloch and Company he suffered seizure and confiscation, although the lots of partnership cotton were but a small per cent upon the cotton purchased and shipped by him on his individual account. The letter on page 66 of the record shows that he had to leave 20 per cent of the cotton of the firm with the Confederate authorities in order to proceed with the balance, and after the most strenuous efforts failed to obtain its release. And again, in attempting to ship cotton for the firm through Eagle Pass, he was compelled to submit to the seizure of one-half of his cotton by the officers of the Confederacy.
*73 So far as the evidence discloses the business of Levy, Blocb and Company from tbe formation of the partnership in March, 1863, until its formal dissolution in November, 1865, it was confined to small transactions in comparison to the business done by the decedent on his own account through his agent Hite. The care with which the cotton regulations of the Confederacy was carried out during the summer of 1864 is shown by the testimony of Gen. Lyman G. Aldrich, who was on duty in the State of Texas in 1864. He says:
“The Confederate authorities had and enforced regulations governing the exportation of cotton from Texas into Mexico. All cotton found west of San Antonio or Goliad was subject to seizure and confiscation if not covered by proper permit from the officers of the cotton bureau located at those two points. And semiweekly I was furnished with abstracts from the officers of the said cotton bureaus designating what cotton had been permitted by them, giving fully and in detail the number of bales, marks, mode of transportation, whether ox or mule train, under whose charge, at what point they propose to cross the Rio Grande, and in fact full and complete information. These abstracts were posted publicly in my office for the information of all concerned, and certified copies were regularly forwarded to the various military commands at the different posts along the Rio Grande, it being part of the various commanders’ duty to watch out for and examine papers of all trains of cotton passing through the district.”
Upon the condition of the cotton trade between the Confederate States and the Republic of Mexico the complainants have taken the testimonjr of Mr. Dwight Ripley, who, in 1864, was officially connected with Confederate cotton bureau in Texas and along the Rio Grande and was in the city of Mata-moras in September, 1864. He says he never heard of the capture, and through his intimate relations with the officers of the army and treasury and wide acquaintance with business men, he could not fail to hear of it had it happened. After giving in detail the condition of the country and road between Matamoras and Eagle Pass, in reply to the last question he says:
“During the autumn of 1864 there were hundreds of enterprising traders temporarily residing in Matamoras who had goods to sell, or having shipped supplies into Texas, were waiting the receipt of cotton in payment. They had correspond *74 ents in every town from Matamoras to Piedras Negras. Any interference with' transportation would have been instantly known and would have produced tremendous excitement. Confederate officials recognized free communication with Mexico as a military necessity to procure indispensable army supplies. Interference with transportation would have been such a deadly blow to Confederate-interests that the whole trans-Miásissippi department would have been startled. The seizure and confiscation of an immense train of 190 wagons, loaded with 1,914 bales of cotton, would have created a whirl of excitement that would have swept the whole Rio Grande country like a cyclone and made an indelible impression on every man residing there. My position with the cotton bureau brought me in daily contact not only with prominent army and treasury officials, but also with scores of traders, to whom interruption of the cotton trade meant financial ruin, yet I never heard mention of any such seizure as is described in question 5, either during my residence in Matamoras or later when at Rio Grande City and San Antonio. I do not believe that any such seizure ever took place, and practically know that it did not.”
Colonel Ford, of the Confederate army, testifies that in the fall of 1864 he was at Brownsville in command of what he called the “expeditionary forces,” and that at that time, in communication with persons engaged in the cotton trade at Matamoras, he never heard of the alleged capture; that it would have been reported to him; was in communication with the Mexican military authorities; both the Imperialist and Mexican Governments in favor of the trade; 100 ships at mouth of Rio Grande bringing merchandise, paying duties at Matamoras; Mexican custom-houses along the Rio Grande; large amount of revenue cotton going into Mexico; must be permitted by the Confederate Government; it would have been impossible to get 1,900 bales through without permit; would have been seized; I knew Weil; never heard of the seizure; was between Eagle Pass and Laredo; don’t know what is opposite; I had agents at Matamoras to look after interests of Confederate citizens; well acquainted with Cor-tina; he was in command at Matamoras until fall of 1864; turned over command and joined the Imperial side; Mejia took possession latter part of September, 1864; saw Cortina just before Mejia came; he was trying to sell me artillery; Mejia came and I got away; impossible for robbery to have happened as charged.
*75 Mr. Coopwood, a lawyer living at Laredo, says, in answer to questions:
“Question. If a wagon train, transporting some 1,900 bales of cotton, bad been captured in Mexico, on its way to Mata-moras, would you probably have heard of the occurrence?
“Answer. At any time between August, 1863, and the close of the war, if such a thing had occurred I would have heard of it, for I was in regular communication with Eagle Pass, Piedras Negras, Laredo, Eeynosa, Brownsville, and Mata-moras, and had men at each of these places most of the time whose duty it would have been to inform me if such a thing had occurred, and I had also a regular communication with the town of Villalduma, in Mexico, State of Nuevo Leon, about 90 miles from Laredo, part of the time by way of Piedras Negras and part of the time by way of Laredo.
“ Question. Did you ever hear of the seizure of such a wagon train loaded with cotton and said to belong to a man by the name of Benjamin Weil?
“Answer. I did not.”
Jose P. Brosig testifies that he was connected with the cotton department of the Confederate States from 1862 to beginning of 1864 at Eagle Pass. In reply to certain questions he says:
“Question. Would it have been possible, in your opinion, for a wagon train conveying 1,900 bales of cotton to be captured in Mexico, between Piedras Negras and Laredo, in September, 1864, without your having heard of the occurrence?
“Answer. No. First, because such a large train could not subsist together. Of course, the capture of such a large amount of animals and wagons and merchandise and cotton would have been the town talk for hundreds and hundreds of miles. Generally, the people on the frontier who are engaged in the smuggling business are warlike and would resist a capture. A train of 190 wagons, with wagon masters, teamsters, cooks, and other dependents, means a force of at least 250 men, which is a larger number of men than Cortina often commanded.
“Question. Am I to infer that you never heard of such a seizure of cotton ?
“Answer. No such seizure, positively, could have taken place without my hearing of it — not of the tenth part of that amount.
‘ ‘ Question. What was the penalty in Mexico for bringing-in cotton or other merchandise in an unlawful way ? .
“Answer. By the laws of Mexico mei’chandise can not cross into that country except through the ports authorized by law. *76 Anybody that crosses merchandise at a place not authorized by the Government loses not only the merchandise but the wagons, the animals that pull the wagons, or pack mules, or whatever it is, and the conductor and all parties connected with it lose their arms.
“Question. Do you remember the state of the water in the Rio Grande in September, 1864?
“Answer. River rises in June and July, remains so until October and November; ferries and flatboats were only at regular ports of entry.”
Maj. John C. Ransom testifies; quartermaster in Confederate States army, at San Antonio, from May, 1864, to May, 1865:
“8. Question. Did you hear of the crossing of a wagon train somewhere between Piedras Negras and Laredo, consisting of 190 wagons,, with 8 mules to the wagon, and loaded with some 1,900 bales of cotton?
“Answer. I never heard of any such 1/rain passing the Bio Grande at cmy place, and no such train could name passed the Bio Gra/nde at cmy time during the summer and fall of 186J, at cmy poi/nt between Piedras Negras a/nd Laredo without my hnowimg it.
“9. Question. What was the probability of a train of that size being thrown across the Rio Grande into Mexico unobserved by the Confederate guard?
“Answer. It was impossible for sucha train to home been thrown across the Bio Gram.de into Mexico at amy time during the war without its being observed by the Gonfederate guards; and at no time during the year 1861¡, could it home been done without being discovered and reported to me by the members of my company, who were then guarding the Bio Grande (p. 472).
“12. Question. State whether or not it would have been possible for a train of that size to be taken across the Rio Grande without your knowledge.
“Answer. No: it was not possible for such a train to home crossed the Bio Grande at any point betmeen Eagle Pass mid Bio Gra/nde City without my hnowimg it.
“13. Question. Did you ever hear of the capture of such a train as I have described, in the latter part of September, 1864, somewhere between Piedras Negras and Laredo, on its way to Matamoras ?
“Answer. No; I never heard of any such train being cap-lured; nor home I receioed any information to the present time of cmy such train being captured except its mention in these questions.”
*77 Capt. Refugio Benevides states he was a captain in the Confederate States army and was on the line from Eagle Pass to Brownsville in May, June, July, August, and September, 1864; it was his duty to guard the Rio Grande; was particularly on duty in September, 1864, between Eagle Pass and Laredo; states that Confederates on one side guarded the river and the Mexicans on the other to prevent cotton going-over without permits and payment of duty; that no such train passed at any time; that it could not have passed without detection. As to the state of the river in September, he says:
“16. Question. Please state the height of the water in the Rio Grande during the months of August, September, and October, 1864.
“Answer. During the months of August, September, and October, 1864, the water in the Rio Grande was 14 to 16 feet above its average low-water mark, and flowed with very strong current, and the river was not fordable during that time between Eagle Pass and Laredo.
“17. Question. Please state how cotton was taken across the river at the various points of crossing you have above named.
“Answer. At Eagle Pass there were ferryboats in which the cotton was crossed over, and there were ferryboats also at Laredo, Rio Grande City, Reynosa, and Brownsville, and part of the time there was a ferryboat at Roma. At the horse crossings I have named no cotton was passed over.
“ 18. Question. Considering the height of the water in the Rio Grande in August, September, and October, 1864, could the 190 wagons above mentioned have forded the Rio Grande at any point 160 miles above Brownsville?
‘ ‘ Answer. During the months of August, September, and October, 1864, it was impossible for such a t/ravn of 190 wagons to have forded the Rio Grcmde at cmy povnt 160 miles above Brownsville, or at any point between the mouth of the river and Eagle Pass.
“Answer. I have continued to reside in Laredo ever since 1864, and have been well acquainted with people on both sides of the river from Laredo to Eagle Pass, as well as down the river to Matamoras, and until the present date I have met no one who knew of such an event as a train of 190 wagons coming together from the interior of Texas to the Rio Grande, or having crossed this river during the freshet of August, September, and October, 1864, or any such train of 1,900 bales of cotton being captured by General Cortina or any other Mexican *78 officer; and it seems to me improbable, if not impossible, that none of the two hundred and odd men who would have been necessary to handle such a train, that none of them should have turned up or been heard from in this country if they had ever been so together handling such a train.
“Refugio Benavides.”
And to the same effect is the following from the testimony of Juan Ortiz, a resident of Laredo:
“Question. What was the condition of the water of the Rio Grande in September, 1864?
“Answer. It was very high. I was shearing' my sheep on ' bank of the river, and many bales of cotton were floating down the river. At the mouth of the Santo Thomas Creek, 8 leagues, or 24 miles, above Laredo, the shearers fished out 32 bales of cotton and I fished out 1.
“Question. With the river in the condition you describe, would it have been possible to get -cotton across into Mexico ?
“Answer. Surely not; unless by rafting or tying 8 or 10 bales together and towing them across with good swimmers; but carts and wagons could not possibly have crossed.”
Mr. J. H. Shropshire, who is now cashier of a bank at Lexington, Ky., was in the year 1864 along the Rio Grande in the cotton trade; never heard of the train or its capture; never saw a train of more than twenty wagons.
Mr. William Schuchardt resided in Piedras Negras from March, 1863, until 1883; merchant; was vice-consul after 1867; never heard of the seizure; knew most of the large cotton merchants; Mexico had custom-houses in each village or town along the Rio Grande; duty not so high as to induce smuggling; liable to be forfeited if duty was not paid; impossible to pass such a train without the payment of duty; would have taken several days; never heard of such a train as described; impossible to get mules for such a train.
Mr. Josiah Turner, who in 1864 was a large cotton merchant at Matamoras, says:
“ I was one of the largest cotton dealers at that time, or rather receivers; m Matannoras, Mexico. I was acquainted with most of the train owners who came to Matamoras. Their trains generally consisted of about 20 wagons; and I never heard of a train of 190 wagons on the road from Piedras Negras to Matamoras. I can, moreover, state that I never heard of a seizure by the Mexican authorities under Cortina.”
*79 Mr. F. F. Farias, wbo was special deputy collector at Mat-amoras, says:
‘‘The position I then occupied in the custom-house would inevitably have made known to me such an important capture, either through public rumor, official reports of the customs guards, but principally through the ‘ guia ’ or permit which every train had to carry while on the road and present to the customs officials when called for.
* * -X- «• -X- -X- *
“The traffic at that time was great and important; there were so many men constantíy on the road that they necessarily became a protection to each other. The large.train referred to could not possibly have been captured by Cortina in September, 1864, for the reason that Gen. Juan N. Cortina was at that time in this city of Matamoras and was hemmed in by the Imperialists, whose troops were besieging the city. On the 26th of September, 1864, General Cortina surrendered this city to the imperial troops, under command of Gen. Tomas Mejia. I very well remember this occurrence, for on the morning of September 26,1864, General Cortina addressed me a communication ordering that the custom-house be kept open for the transaction of business. I maintained the office open until 4 o’clock p. m., on the said 26th of September, 1864, at which hour General Mejia entered the city at the head of his troops, passing in front of the custom-house.”
The testimony of these witnesses, excluding their opinions and statements on what was probable and possible, is competent and important as tending to show the condition of the cotton trade on both sides of the river, the regulations and vigilance of the Confederate Government, and the fact as to whether they had any knowledge or information on the subject of the seizure of the cotton of the decedent.
As to whereabouts of General Cortina, Captain Benevides says:
“Question. It is said that this capture was made by General Cortina. Can you say whether General Cortina was operating with his command so high up the river and so short a time before the occupation of Matamoras by General Mejia, on September 26, 1864?
“Answer. General Cortina came up to New Laredo, on the opposite bank of the river from Laredo, Tex., after Mejia took possession of Matamoras-, and I conversed with him there in New Laredo and he told me that Mejia had already taken Matamoras, and this was some time during the latter *80 days of September to the early days of October, 1864; but be did not go any higher up the river than New Laredo. He remained in New Laredo about a week, during which time he visited me in Laredo, Tex., and returned down the river.”
Major Brosig says:
“Question. Were General Cortina and his command at any point between Laredo and Eagle Pass in September,'1864?
“Answer. They could not have been there because General Cortina had concentrated all his forces near Matamoras, to make resistance against the imperial general, Tomas Mejia, who was marching from Monterey against Matamoras. Neither then nor afterwards did I ever hear or know of General Cortina.coming up as far as Laredo.”
It is insisted by the counsel for the respondents that the existence of the train and cotton is established by the testimony of Hite, Shackleford, Justice, Martin, Landner, and Weil before the commission and that in this case their tes timony is corroborated and strengthened by the testimony of Sumpter and the witness Pridgen produced by the complainants, that in all ten witnesses have testified to the existence of the train.
In this connection it is proper to note that an attempt has been made on the part of the complainants to disparage and destroy the evidence of Hite by the testimony of John Jenny by proving a conversation which he had with Hite after he had given his testimony to be used before the commission. We think such testimony is incompetent and should not be considered to the prejudice of Hite. In the case of Mattox v. The United States (156 U. S., 287), it is said- in substance before a witness can be impeached by proof that he has made contradictory statements out of court a foundation must be laid by interrogating the witness himself as to whether he has made such statements. So it is said in substance in the case of Ayers v. Watson (132 U. S., 394), before a former declaration of a witness can be used to impeach or contradict his testimony his attention must be drawn to what may be brought forward for that purpose with particularity as to time, place, and circumstance so that he can deny it or make any explanation he desires. These decisions state one of the fundamental principles of the law of evidence.
The complainants have also introduced evidence tending to *81 reflect on the moral character of Hite and his reputation for truth and veracity.
Taking- such parts of that class of evidence which in our judgment are competent on the issue of the reputation of the witness for truth, we are of the opinion that the testimony is not sufficient to impeach the character of Hite so as to exclude from the consideration of the court his evidence.
In connection with the present reference to the testimony of Hite, it is proper to consider what Loeb says as to his knowledge of Hite. About the 11th day of July, 1865, Loeb received a letter from Hite, dated at Shreveport, as follows:
“ShrevepoRt, Jan. 11th, 1865.
“Mr. S. E. Loeb,

“Houston, Texas.

“Sir: You will please say to Mr. G. Jenny, of Matamoras, that I will leave here under a transfer to Messrs. Weil & Jenny for ninety (90) days on the 15th January, 1865, for your city. If Mr. Jenny has left for Matamoras, please write him on the subject; and by so doing you will much oblige, “Yours, respectfully,
“Geo. D. Hite.”
As to this letter Loeb says:
“Question. Mr. Loeb, state when, to your recollection, as refreshed by these documents, Mr. Geo. D. Hite first reported to you.
“Answer. This is dated January 11, 1865, and he reported some time afterwards.
4 ‘ Question. About when ?
“Answer. It must have been between the 15th and 20th of January, 1865.
“Question. Had you ever seen Mr. Hite before?
“Answer. 1 did not know Mr. Hite; but I.had known another Mr. Hite, but not George.
“Question. Is that, to your knowledge, his first connection with your firm ?
‘4 Answer. It is, beyond a question of a doubt. ”
The respondents’ counsel in order to relieve the affidavit of John M. Martin filed before the commission from the effect of testimony given by a John M. Martin in a proceeding before United States Commissioner Grant, in New Orleans, on December 29, 1871, and the testimony of Mrs. Mary P. Nicholson, a daughter of John M. Martin, raises the question of identity as between the John M. Martin making the affidavit *82 and the person appearing before the commissioner in 1871 and the father of Mrs. Nicholson. The identity, we think, is established, and it is therefore competent to consider the original affidavit as affected by the subsequent testimony. The Martin who made the affidavit states that he was born in Belmont County, Ohio, and is by occupation a steamboat pilot.
In her direct testimony Mrs. Nicholson states that her father was in Ohio from about the first of June, 1864, until some time in the spring of 1875; but, upon cross-examination, after seeing her father’s affidavit she is not certain as to the year. Taking all her evidence, direct and cross examination, the court is foi'ced to conclude that hei best recollection is that her father was in Ohio at the time it is alleged ho was in Mexico. The complainants seek to desti^ the effect of Martin’s testimony1- by showing that he made statements contradictory of his affidavits after the rendition of the award, but for the reasons assigned in reference to the testimony of Hite we exclude such testimony.
Next to Hite the most important witness for the respondents is Mr. Samuel B. Shackleford, who testifies that ho was at Alley ton when the train was started by Weil, and was with it at the time it was captured by the Mexican soldiers, between the 10th and 25th of September, 1864. Shackleford swears he was on duty in Mexico, at the time of the capture, in the interest of the Confederacy, connected with the clothing department.
The testimony of the witness as to the agency of the Confederacy in Mexico is materially affected by the testimony of Major Haynes, chief of the clothing bureau of that department, who in substance swears he has no recollection of having an agent accredited for service in Mexico, and the further testimony of Confederate soldiers who were in the same department with the witness during the time he alleges he was at Alleyton and Mexico.
The affidavit of John J. Justice was filed before the commission, in which ho testifies to the taking of the cotton about the time stated by the other witnesses. He was engaged in driving a stage from Matamoras to Piedras Negras, and witnessed, as he says, the capture of the train.
The affidavit of Martin, as has been stated, shows that he *83 was present at the time of the capture, but does not state any reason wby he was in company with the train, but simply that on the 20th of September, 1864, “in company of a large wag'on train loaded with cotton belonging to Weil * * * and was present at the taking of said property * * * and likewise of the turning loose of the mules and horses.” The peculiarity of this testimony is that the witness states that the mules and horses were abandoned by the marauders as worthless and unnecessary. According to Martin’s version of the capture, the cotton must have been unloaded by the Mexican soldiers and the mules and wagons left in the possession of the agents and drivers of the decedent. That would have been a most extraordinary course, and it is most difficult to believe that the cotton alone was captured and the means of transportation abandoned by the captors.
Sumpter and Pridgen testify to the ownership and possession of a large amount of cotton by Weil, both at Eagle Pass and Alleyton, and while they both have á vagué and indefinite recollection, they put the amount in round numbers at two thousand bales. It is true that Weil did have cotton at Eagle Pass as a partner of the firm of Levy, Bloch & Compaq*-, and was marked “B. W.,” and it may be that after the lapse of so many years the memory of Sumpter has become confused in amounts.
Pridgen says that the cotton was detained at Eagle Pass; that is also true of the cotton which was shipped to Eagle Pass by Weil for the firm of Levy, Bloch & Company. He says, in substance, that the cotton was transported by teams hired by the Confederate government. Hite does not mention the Confederate government in connection with the transportation, but leaves it open to the inference that he procured the shipment by agencies other than the Confederate authorities.
Pridgen says he contracted with teamsters for the transpor tation, and thinks there were between 1,500 and 2,000 bales, and that it was consigned to Captain Lee, of the C. S. A. He says the cotton was procured from George Whitting at Alley-ton. This witness, if he does not intend to be false in his testimony, has confounded some large transaction ho had with cotton of the Confederacy with cotton with which Weil had a *84 connection. The theory of the respondents’ claim is that the cotton crossed the Rio Grande at some point between Piedras Negras and Laredo. Shackleford swears in contradiction of Pridgen, as to the shipment of the cotton, “That he knew of the business and was in contact with the agents and clerks every day; saw drafts drawn by Weil and payment made for the use of teams.” If this be true, it may be inquired, Where are the numerous agents and clerks and the drafts drawn in payment of the hire of teams ? It may be presumed that the most of the drafts were drawn on a bank or some mercantile firm, from whom some of them could have been procured as evidence in this case.
It is insisted bjr the counsel for the respondents that ten witnesses have testified as to the ownership and loss of the cotton as alleged. That may be true, and yet it does not follow that the ownership and loss is established as against what is shown upon the part of the complainants.
As has been said, the respondents- have a prima facie case which must bo overcome by the testimony offered on the part of the complainants. The prima facie case, based upon the award and sustained by such testimony as has been offered on the part of the respondents, must withstand the effect of the proof offered upon the part of the complainants upon the allegation that the award was obtained by the fraud of the decedent. The law does not presume fraud, and it must lie shown by a clear preponderance of the evidence that it exists. The presumption of innocence surrounds and faithfully guards the lives and transactions of men, but always subject to the condition that truth must prevail when it is shown that it antagonizes the presumption.
It is not necessary to pursue in detail the evidence further, and we will content ourselves with the statement of general propositions and conditions which indicate the truth underlying this most extraordinary claim and this almost boundless field of testimony.
The claim of the decedent is founded on the testimony of witnesses depending entirely upon their veracity and memory; no undisputed contemporaneous record or condition is brought to sustain them. The claim itself is of great magnitude, involving the use and possession of money and facilities of labor *85 in the collection and transportation of cotton out of all proportion to tbc means and ability of the decedent.
The conduct of the decedent after the alleged capture was most extraordinary and tends to contradict the alleged ownership and loss.
No evidence is offered by the respondents ■ that the claim was ever presented to or pressed upon the consideration of the Government of Mexico, notwithstanding the lawful government of that country was in full possession of its functions and unmolested in its internal administration for more than three years before the presentation of the claim to the Government of the United States. It is true that the decedent' swears in his claim that he often solicited the release of his property but could get no satisfaction. '
The respondents offer no evidence tending to show that the decedent became possessed of the amount of money necessaiy to purchase and control by transportation the amount of cotton alleged to have been lost; but, upon the contrary, evidence offered on the part of the complainants establishes a pecuniary condition on the part of the decedent absolutely contradictory of the theory that he had in 1863 or 1864 means sufficient to engage in and successfully prosecute to the point claimed the purchase and transportation of the alleged cotton.
The contention of the respondents is that the cotton was purchased by the agent of decedent, George Hite, and that he paid for it in gold and greenbacks; yet the record is silent of any transaction with bank or banks or express companies in the custody or transportation of any part of the money.
The evidence on the part of complainants establishes that the decedent had not sufficient ready money at the time the consolidated company was organized to meet his responsibility as a member of that firm, much less to engage in the mammoth enterprise of purchasing 1,914 bales of cotton and transporting it beyond the Bio Grande into the territory of Mexico.
The alleged purchase and ownership of the cotton was in violation of his duty as a member of Levy, Bloch and Company, to which he had pledged, by implication at least, his undivided effort as a cotton trader, and his pecuniary condition as a member of that firm at Matamoras near the time of his alleged purchase by his agent, Hite, contradicts the con *86 tention tbat ho was possessed of such affluence in the person of his agent in the State of Texas.
The absolute ignorance of his most active partner in the firm of Levy, Bloch and Company of his conceded dereliction of duty towards that firm, in the purchase and ownership of 1,914 bales, is a very strong moral indication against the truthfulness of the alleged ownership.
If the alleged capture be true, the consequence was that the decedent lost by such capture what was allowed him by the award of the umpire, to wit, $285,000; and, if so, it must have entailed on him, because of his pecuniary condition as shown by the proof, a condition of bankruptcy, and yet the record is silent as to that condition manifested in the existence of unpaid debts and pressing creditors.
If the claim is a just one, it has many strange, unusual, and suspicious incidents.
Without the knowledge of his partners, Weil, in the years 1863 and 1864 organizes in the person of his agent, Hite, a scheme to buy a large amount of cotton, which he successfully accomplishes, apparently without means; collects that cotton at the quiet village of Alleyton unknown to his partner, Loeb, who was present there many times during the period covered by the transaction and unknown to the resident witnesses who were engaged in the cotton trade, and others who had every facility of observation, successfully transports it from Alleyton across the Kio Grande, escaping the vigilance of all of the officers and agents of the Confederate government, though moving with a caravan such as would require •the agency of a great quartermaster to manage; stripped of his treasure by a force not necessarily inimical to his enterprise, and then resting in the quietness of a concealed grief, unmolested by creditor, for a space of nearly six years, when he presents to the mixed commission a claim for $334,950.
The testimony offered on the part of the complainants establishes a series of conditions absolutely incompatible with and contradictory of the alleged ownership and transportation of the cotton by the decedent.
The agency of Hite is most seriously questioned by the evidence tending to show that during the latter part of 1863 and all of 1864 he was engaged as a steamboat man at Shreveport, *87 Louisiana, in the service of the Confederacy, and that it was physically impossible for him to be engaged in the purchase and care of the cotton as claimed by the respondents.
The respondents have offered some evidence tending to show that he was absent from Shreveport a part of the time, but the preponderance of the evidence is that he was there the most of the time in the year 1864: and could not have been engaged in the purchase and transportation of any considerable amount of cotton from Alleyton to. Matamoras.
As has been said, if the evidence contradicts the allegation that the cotton was shipped from Alleyton then the whole superstructure of the case falls, as there is no pretence that any part of it was shipped from any other point.
Alleyton was at that time a small place in the interior of Texas, but was a great point for the collection and shipment of cotton. Its inhabitants being limited, their observation would extend to a most intimate knowledge of persons and conditions with reference to the cotton trade.
Without recapitulation it is sufficient to say that the evidence from the most reliable sources establishes a condition of the cotton trade at that point which contradicts the claim of the respondents that Hite shipped or had shipped from that point the cotton in controversy.
That conclusion must be reached, notwithstanding Shackle-ford swears in September, 1864, that Weil was taking out a large train loaded with cotton “to penetrate the territory of the United States of Mexico toward Laredo,” and notwithstanding what Hite and Pridgen say. Upon the point as to whether the cotton was shipped from Alleyton the proof is conclusive in favor of the contention of the complainants.
Much was said in the argument as to the extent and appearance of the train which it is alleged hauled the cotton from Alleyton across the Rio Grande to the place of its capture. While Weil says, in his original claim, “I had several trains,” the weight of the evidence of respondents is that the train was substantially one train, and-.it is a fair inference from the testimony of the respondents that the cotton was shipped, if at all, substantially at the same time and must have left Alleyton at the same time and kept together during its entire progress.
*88 It is the uniform testimony of the witnesses for the complainants that such a train would have been the wonder of the history of the cotton trade, as a train of twenty wagons was the largest train that had been observed bjr any of the witnesses.
The most remarkable feature of the claim is that such a train should have escaped the vigilance of the officers and agents of the Confederacy and passed beyond the Eio Grande. The testimony shows that the most watchful care was taken to prevent frauds in the cotton bureau of the Confederacy by the officers in charge, and without retying upon the testimony of such officers as to what was possible or impossible to happen, it is sufficient to say that many of them testify that they never saw such a train, never heard of it, and none swear to any knowledge except Shackleford, who claims to have been present when the train left Alleyton. The testi mony offered on the part of the complainants, though nega tive in its character, is the evidence of witnesses who have every facility of knowledge, who are above reproach in their moral character, and beyond suspicion because of any preju dice or interest. The absence of proof on the part of the respondents of any difficulty with Treasury agents as to the shipment of the cotton, when it is shown .that Levy, Bloch & Co. had much trouble, is remarkable.
That 1,914 bales of cotton should have been shipped from Texas to Mexico without having a trace of it in the civil archives of the Confederate Government is most incredible. That it should have escaped observation of those whose duty it was to observe and those who without duty had every fácil ity to see is highly improbable, and those two facts alone bring the deepest shadows of suspicion on the genuineness of the claim.
That the caravan should have escaped the eye of the civil and military authorities of the Confederacy and should pass without let or hindrance from the State of Texas to the terri tory of Mexico across the Eio Grande where there was no custom-house, at a point selected simply because there was a good ford, is most unreasonable.
Hite’s tes timo 113^ indicates that he intended to be under *89 stood that he bought the cotton in the vicinity of Alleyton, and the presumption would be that it was bought from planters living in that part of Texas, and yet not a person is introduced by the respondents to show the purchase of a single bale; and so of the teamsters employed in the transportation — not one of them is introduced for the purpose of show-the service of team or man. A force of that kind taken into the service of the decedent would have drained the country far and near of men capable of physical labor, and that, too, when the Confederacy had induced or conscripted the service of nearly every man able to bear arms. Colored men may have driven the teams, but it is not to be presumed that they sold the cotton or furnished more than fifteen hundred mules to draw the wagons.
Taking the whole case as it is developed by the evidence, disregarding such portions of it as are incompetent, and giving due force to the legal effect of the award of the commission as establishing a prima faci'e right, not to be invalidated unless upon a clear preponderance of proof, on the issues made by the bill and answer, the court determines as a conclusion of fact and law that the award was obtained as to the whole sum included therein by fraud effectuated by means of false swearing and other fraudulent practices upon the part of the decedent, and therefore a decree will be entered that all claims in law and equity on the part of the respondents to the money recovered from the Eepublic of Mexico, and not yet distributed for or on account of such award, be forever barred and foreclosed.
This being a proceeding in equity we make no findings of fact, and pursue the same course adopted in La Abra Oase, which has been affirmed by the recent decision of the Supreme Court.